835 P.2d 1299

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Charles Richard RUSSELL, Defendant–Appellant.**

**No. 19621.**

Supreme Court of Idaho, Pocatello Term, May 1992.

Aug. 12, 1992.

Steven G. Wood, Pocatello, for defendant-appellant.

Larry EchoHawk, Atty. Gen., Myrna A.I. Stahman, Deputy Atty. Gen., argued, Boise, for plaintiff-respondent.

BAKES, Chief Justice.

This appeal arises from an order of the district court revoking the defendant Charles Russell's probation and denying his I.C.R. 35 motion for reduction of sentence.[1] Russell appealed the district court order, and the Court of Appeals reversed the district court's revocation of Russell's probation. The State then filed a petition for review of the Court of Appeals decision, which this court granted.

Russell pled guilty to two counts of obliterating the vehicle identification numbers on snowmobiles in June, 1988, and was sentenced to two concurrent five-year terms. Execution of the sentences was suspended, and Russell was placed on probation. Russell violated several of the conditions of his probation, and the district court revoked his probation in August, 1989, at the same time amending the sentences down to one year fixed and three years indeterminate, which he commenced serving. The court retained jurisdiction for 180 days.

On February 27, 1990, at the end of the retained jurisdiction period, the court brought Russell back and again placed him on probation, including as a condition of that probation that Russell "not contact his wife in any fashion." However, the court allowed Russell to go to his wife's home to pick up some of his personal belongings if he was accompanied by a "responsible adult." That same day Russell went with his lawyer to his wife's home when she was not present, broke in through the back door of the garage, splintering the door casing, and obtained certain of his personal belongings. The next day, at Russell's request, his stepfather telephoned Russell's wife, asking her to speak with Russell regarding their taxes, automobile insurance, and other documents.

The district court was informed of Russell's contact with his wife and ordered him into court on March 3, 1990, to determine if he had violated his probation. At the end of the hearing the trial court revoked his probation and ordered the remainder of the suspended sentence to be served. Russell later filed a motion to reconsider his probation revocation. The trial court treated this motion as a Rule 35 motion for reduction of sentence and, after a hearing, denied the motion. Russell appealed the trial court's decision.

On appeal, the Court of Appeals reversed the district court's order revoking Russell's probation, holding that the condition of probation prohibiting him from contacting his wife was unreasonable.[2] The State filed

---

1. Russell's notice of appeal, filed on March 26, 1990, purports to appeal from the "final judgment of conviction entered in the above entitled action on the 11th day of August, 1989, . . ., the order revoking appellant's probation entered in the above entitled action on the 2nd day of March, 1990, and the order denying the Rule 35 motion of appellant dated the 13th day of March, 1990. . . ." The latter two orders are within 42 days of the time that the notice of appeal was filed. However, the original final judgment of conviction was entered on August 11, 1989, and no appeal was filed within 42 days of that date. Under I.A.R. 17(e)(B) a notice of appeal may only be filed from those final judg-

ments "for which the time for appeal has not expired." Therefore, there is no jurisdiction to consider the original final judgment of conviction in this appeal.

2. The Court of Appeals also held that the district court properly dismissed Russell's Rule 35 motion challenging his probation revocation because the motion was not timely filed. The court rejected the other issues which Russell attempted to raise either because they had not been raised in the trial court or were not timely raised on appeal.

this petition for review.[3]

■ Preliminarily, regarding our standard of review, when this Court reviews a decision of the Court of Appeals, we give consideration to the ruling of the Court of Appeals, but make an independent appellate review of the trial court's decision. *Rice v. Hill City Stock Yards*, 121 Idaho 576, 826 P.2d 1288 (1992); *Sato v. Schossberger*, 117 Idaho 771, 792 P.2d 336 (1990). If substantial and competent, though conflicting, evidence supports the trial court's findings of fact, we will uphold those findings on appeal. *Rice v. Hill City Stock Yards, supra; MacNeil v. Minidoka Memorial Hosp.*, 108 Idaho 588, 701 P.2d 208 (1985).

■ Russell argues that the condition of probation that he not "contact his wife in any fashion" was unreasonable. In rebuttal, the State argues that Russell failed to raise the issue at either the probation hearing in which the condition was imposed or at the probation revocation hearing, and therefore Russell cannot now raise it on appeal. We have recently reiterated that issues not raised before the trial court will not be considered on appeal. *State v. Pizzuto*, 119 Idaho 742, 810 P.2d 680 (1991); *State v. Martin*, 119 Idaho 577, 808 P.2d 1322 (1991). A review of the record discloses that Russell did not raise the issue of the reasonableness of the condition either when it was imposed or at the violation of probation hearing. The only issue raised was whether his actions violated the terms of the probation. Accordingly, Russell's claim on appeal that the term of probation that he not contact his wife was unreasonable has not been preserved. *State v. Martin, supra.* The Court of Appeals decision concluding otherwise is vacated.

■ Russell nevertheless argues that, aside from his reasonableness claim, there was insufficient evidence for the trial court to revoke his probation. Specifically, he argues that the condition that he not "contact his wife in any fashion" was vague and that he thought it meant only that he could not speak to her personally. Russell also argues that his asking his stepfather to telephone his wife did not warrant the trial court's decision to revoke his probation. The trial court, exercising its discretion, concluded otherwise. We find no abuse of discretion. *State v. Hooper*, 119 Idaho 606, 809 P.2d 467 (1991); *State v. Barton*, 119 Idaho 114, 803 P.2d 1020 (Ct. App.1991) ("Once a probation violation has been proved, the decision to revoke probation and pronounce sentence is within the sound discretion of the trial court."). The trial court explicitly stated to Russell that "you will not contact your wife in any fashion. You will not go onto her premises or into her dwelling without any exceptions." Mark Branson, a probation officer, testified at the probation violation hearing:

THE COURT: Did you have any discussions with [Russell] about contacting his wife?

THE WITNESS: I did that same evening, which should have been Tuesday the 27th. This would have been after they had been to the home. He came to my office, as he was getting ready to leave we discussed any potential contact with his wife. He was informed by myself and by Mr. Peterson that he was to have no contact whatsoever. He inquired about what about the insurance on my truck, I need to get ahold [sic] of her about that and such things as that. *He was advised at that time that any contact that was necessary would have to be handled through his attorney.* We discussed that before he left the of-

---

3. Russell was released on parole on March 5, 1992, after the Court of Appeals opinion was released. Subsequently, the State filed a motion to dismiss this appeal, arguing that since Russell had been released on parole, his attack on his probation revocation had become moot. We disagree. As counsel for Russell argued before this Court during oral argument, if Russell had been released on probation rather than parole, and if he successfully completed his term of probation, he would have had the opportunity to reduce his conviction to a misdemeanor. Also, the penalties for violating a condition of probation can be less severe than that for a parole violation, which is generally an immediate return to jail. Accordingly, we conclude that this case is not moot and deny the State's motion to dismiss the appeal.

fice. That came up again later that evening when I was at his home. *I again told him any contact whatsoever has to be handled through your attorneys.* So there were two times on the 27th. (Emphasis added.)

In light of Mr. Branson's testimony and the trial court's specific statement to Russell that he not contact his wife *"in any fashion,"* we conclude that Russell should reasonably have known that when he asked his stepfather to call his wife he was violating the court's order.

■ The trial court had ample opportunity to determine whether Russell was an appropriate candidate for continued probation. His probation had been revoked once before for numerous violations. He had been before the court many times. Throughout Russell's various court proceedings, the trial court repeatedly remarked that he had an extremely poor attitude and that he had been "defiant to all kinds of authority," "resistive to the probation officer," and that he had "argued with the Court." The trial court was able to judge Russell's demeanor throughout these proceedings. After noting that Russell had an extremely poor attitude, the court considered the threat to society if Russell continued to be released on probation. He looked at Russell's previous actions while on probation, understandably concluding that Russell would be likely to violate any probation conditions in the future, given his past record.[4] In view of these facts, we hold that the trial court did not err in revoking Russell's probation.

■ Russell contends that the trial court improperly based its decision to revoke his probation on the court's previous concerns with Russell and on the method in which Russell broke into his wife's house to get his personal belongings. Russell's past behavior and his method of entry into his wife's house were factors which the trial court was entitled to consider in determin-

ing how to exercise his discretion in the revocation proceeding.

In the process of determining whether a grant of probation is appropriate ..., the trial court necessarily must be permitted to evaluate a broad range of information about the defendant's personality. This information may be gathered from many sources.... Very little information about a defendant will be irrelevant to the effort of the law to individualize treatment of convicted persons.

*State v. Moore,* 93 Idaho 14, 17, 454 P.2d 51, 54 (1969). In that same case, the Court stated:

In a determination of the appropriateness of a grant of probation, the trial court must consider the defendant's "previous character and actions, * * * [his prospects for] abid[ing] by the terms of his probation and * * * [for] rehabilita[ion,] and * * * the interests of society." The primary consideration has been stated to be the "good order and protection of society."

*State v. Moore,* 93 Idaho 14, 17, 454 P.2d 51, 54 (1969), *quoting State v. Moore,* 78 Idaho at 359, 363, 304 P.2d 1101–1103.

Next, Russell argues that the trial court erred in denying his Rule 35 Motion. The Court of Appeals held:

I.C.R. 35 permits the filing of such a motion "upon revocation of probation." The trial court revoked Russell's probation on March 2, 1990. Russell did not file his Rule 35 motion until March 9, 1990. The motion was untimely, and absent any special circumstances or any misleading conduct on the part of the government which could explain the delay, the trial court has no jurisdiction to entertain the motion. (Citation omitted.) Thus, the trial court did not err in denying the motion.

■ We agree. "When a reduction of a sentence is sought upon revocation of probation, the motion must be made at the time probation is revoked. It cannot be

---

**4.** At the probation revocation hearing, the trial court stated:

This Court believes that Mr. Russell is and could be a threat to society. I gave him every

opportunity to prove himself ... and here he is right back in court in violation of another court order....

filed after revocation and after the prison sentence has been ordered into execution." *State v. Hocker,* 119 Idaho 105, 106–07, 803 P.2d 1011, 1012–1013 (Ct.App.1991).

■ Finally, Russell argues that the trial court erred by failing to grant his motion to dismiss at the end of the State's case in chief at the second probation revocation hearing. He contends that there was inadequate proof that he requested his stepfather to phone his wife and thus the State failed to prove its case and the motion to dismiss should have been granted. However, Russell's estranged wife testified, without objection, for the State that:

> He [Russell's stepfather] called, he said, "Richard would like to talk to you." And I indicated to him at that time, I said, "Why didn't he contact me or talk to me before they decided to break into my house yesterday?" Tony said, "I don't know about that." I said, "Then I suggest you ask him about that." He said, "All he wants to talk to you about is your taxes." And I said, "I suggest he call and talk to the attorneys about it, then," and I hung up.

In this probation violation proceeding, that was sufficient evidence that the call was made at Russell's request to survive a motion to dismiss. Russell himself acknowledged in his testimony that he had in fact asked his stepfather to make the call. The trial court did not err in denying Russell's motion to dismiss the action to revoke his probation.

We affirm the trial court's decision to revoke Russell's probation. That portion of the Court of Appeals opinion holding otherwise is vacated. We also affirm the trial court's decision to deny Russell's Rule 35 motion.

JOHNSON and McDEVITT, JJ., and CAREY, J. Pro Tem., concur.

BISTLINE, Justice, dissenting.

After reviewing the State's petition requesting this Court to grant review, my vote was that we *not* do so. The Court of Appeals in a unanimous opinion, per Judge Silak, demonstrated that considerable time and effort had been devoted to arriving at a fair and reasonable conclusion, one that in my view should have suggested that this Court could have better expended its time and energy on some appellate controversy other than one which had been thoroughly considered and decided, thereafter leaving further proceedings up to the district judge who had presided in the State's prosecution against Russell. On that point, often have I ventured the thought that the best insight into any litigation will come from, first the participating attorneys, and second, the trial judge, and in this instance, third, the appellate court which labored with the controversy, coming up with the conclusion that the district court should be given the opportunity to reconsider its decision after receiving the benefit of the comprehensive collective recitation of three capable judges. My confidence in the particular trial judge is boundless; he is an excellent trial judge, and a person who one would expect to take another look backward at a criminal trial with interrelated overtures of domestic intranquility, all of which produced a degree of frustration not ordinarily encountered, concerning which more will be stated later herein when my review is documented and concluded.

The Court of Appeals, after appellate argument was fully presented, took the controversy under consideration and came to a conclusion to which I readily subscribe: "We agree that the condition [imposed by the district court] was unduly restrictive." *State v. Russell,* 122 Idaho 515, 518, 835 P.2d 1326, 1329 (Ct.App.1991). In support of that conclusion, the Court of Appeals reasoned:

> In the present case, the court imposed a probation condition requiring that Russell would "not contact [his] wife in any fashion." Russell's conviction was for altering the vehicle identification numbers on snowmobiles. *There is no evidence that Russell's contact with his wife bore even tangential relationship to his criminal activity.* Communicating with a spouse is not itself a criminal activity. Thus, the probation condition prohibiting Russell from contacting his wife was unreasonable. Probation may

not be revoked on the single ground that there was a violation of an improper provision of probation. For this reason, it was an abuse of discretion to revoke Russell's probation on the basis that he had a third party contact his wife. Because we have found the condition unduly restrictive, we do not reach the issue of whether it was ambiguous.

Russell, 122 Idaho at 519, 835 P.2d at 1330 (1991) (emphasis added).

Probably the most dismayingly dismal judicial rationale anyone might ever expect in a criminal case surfaces in the final paragraph of this Supreme Court's majority opinion:

> Finally, Russell argues that the trial court erred by failing to grant his motion to dismiss at the end of the State's case in chief at the second probation revocation hearing. He contends that there was inadequate proof that he requested his stepfather to phone his wife and thus the State failed to prove its case and the motion to dismiss should have been granted. However, Russell's estranged wife testified, without objection, for the State that:
>
>> 'He [Russell's stepfather] called, he said, "Richard would like to talk to you." And I indicated to him at that time, I said, "Why didn't he contact me or talk to me before they decided to break into my house yesterday?" Tony said, "I don't know about that." I said, "Then I suggest you ask him about that." He said, "All he wants to talk to you about is your taxes." And I said, "I suggest he call and talk to the attorneys about it, then," and I hung up.'
>
> In this probation violation proceeding, that was sufficient evidence that the call was made at Russell's request to survive a motion to dismiss. Russell himself acknowledged in his testimony that he had in fact asked his stepfather to make the call. The trial court did not err in denying Russell's motion to dismiss the action to revoke his probation.

The actual circumstances make it abundantly clear that most reasonable persons will conclude that the thrust of the case against Russell, violation of probation, should not have hinged on the question of whether he was guilty of asking his stepfather to call his wife by telephone. Clearly the important fact is that Russell *did not* call her. His stepfather did so at Russell's request relative to a wholly innocuous question regarding income taxes and insurance policies.

The Court, not much to its credit, takes little note of the lucid discussion presented in the brief which defense counsel, Steven G. Wood, presented to the Court on behalf of Mr. Russell:

"This appeal arose when Defendant's probation was revoked because he had his step-father telephone Defendant's wife."

"Defendant was originally charged with two counts of Grand Theft By Possession in violation of Idaho Code 18–2403(4) and 18–2407(1), one count of Selling or Disposing of Vehicle With Altered Serial Number in violation of Idaho Code 18–2410(2), one count of Conspiracy to Sell or Dispose of Vehicle With Altered Serial Number in violation of Idaho Code 2410(2) and 18–1701, one count of Insurance Fraud in violation of Idaho Code 41–1325(1), and one county of Obliterating, Removing or Stamping a Vehicle Identification Number in violation of Idaho Code 49–1128(3)."

"At the preliminary hearing, the prosecution dismissed counts 2, 3, 4, and 5 of the complaint and amended Count 1 to a second charge of Obliterating, Removing or Stamping a Vehicle Identification Number in violation of Idaho Code 49–1128(3), a felony."

"Pursuant to plea negotiations in exchange for the dismissals of the other counts, Defendant waived the preliminary hearing and was bound over to district court on the two counts of Obliterating a Vehicle Serial Number."

"In District Court the Defendant pleaded Guilty to the charges, and a pre-sentence report was ordered, and a time set for sentencing."

"Sentencing was held on September 12, 1988, at which time the issue arose con-

cerning restitution to victims of the crimes which had been dismissed. The court concluded *that it could not consider restitution on the dismissed charges,* and proceeded to order some restitution paid by Defendant and to sentence Defendant on Count I to a minimum term of two years plus an additional 3 year indeterminate period, and an identical sentence on Count II, to run concurrently. The Court retained jurisdiction for 180 days."

"Defense counsel then filed a motion pursuant to Rule 35 ICR, asking that the restitution ordered to Kruse Insurance be withdrawn, because it related to one of the dismissed counts, and asking that Defendant be allowed to serve his time in the Bannock County jail because of his physical (medical) condition. *The Court* denied the motion, and further *stated that as a term and condition of probation the Defendant must pay restitution to all victims the prosecution could prove were damaged by him, whether or not it related to the crimes to which Defendant pleaded guilty.* The Court retained jurisdiction for 120 days because of Defendant's medical condition."

"In October 1988, the District Court held a hearing to consider suspending Defendant's prison sentence and allowing him to spend time in the Bannock County jail and receive the therapy he needed. *The prosecutor felt this might be appropriate on condition that Defendant would pay restitution to ALL victims.*"

"In November 1988, the *Court released Defendant from jail upon his payment of $7,000* [an accomplished fact] to go to all the victims and a promise to pay whatever else might be determined to be necessary."

"In December 1988, further proceedings were held *relating to the terms of Defendant's probation and the restitution to be paid.* Defendant's sentence was suspended and he was placed on 5 years probation, upon certain conditions, including payment of restitution. The Court indicated that the charges could be reduced to a misdemeanor if the Defendant paid the restitution and fulfilled his probation."

"In July of 1989, the Defendant was brought before the court on a probation violation charge for various violations. The Defendant admitted to the violations."

"In August 1989 the disposition hearing was held on the probation violation and the Court revoked the probation and, without advance notice, the court changed the Defendant's sentence to consecutive terms of three years fixed on Count I and three years indeterminate on Count II."

*"Defendant fulfilled his 180 [day] rider, and was returned to District court with a recommendation of probation.* The District court granted probation to Defendant on February 27, 1990, and revoked the probation on March 2, 1990, because Defendant violated the court's verbal order relating to having no contact with his wife."

"This appeal followed."

## "A) FACTS RELATING TO THE ISSUE OF RESTITUTION."

"Defendant was obligated to pay restitution to all victims ... even victims of charges which were dismissed ... before he would be granted probation."

"The issue of restitution was raised by the prosecution before the District court in the initial Sentencing appearance of Defendant before it on August 22, 1988. *At that time the prosecuting attorney had no objection to the Court granting probation ....:*"

'MR. ODDO: We would not oppose probation, Your Honor, if he's willing to further work with the State Police in clearing up everything and make restitution to Royal Insurance Company and Safeco, we would not oppose probation, Your Honor.'

"In the continued Sentencing hearing three weeks later, there was argument whether the Defendant must pay restitution to only the victims of the crimes to which he pleaded guilty, or also to the victims of the charges which had been dismissed and others that came to light as a result of his talks with the police. The District Court finally concluded that"

'... there was nothing on the record from the Prosecuting Attorney's Office that the Court was to consider other criminal conduct with respect to restitution.'

"And further,"

'And the Court is not pleased at all with this case at all. In most criminal cases when the Prosecuting Attorney's office dismisses charges against a defendant, the Court is asked to take into consideration the restitution to the victims in this community for criminal conduct by those being sentenced. Unfortunately that wasn't done in this case, and the Court has no power to order this defendant to pay restitution on charges that were dismissed by the Prosecuting Attorney's Office ... *The Court is going to have to proceed in this case and order restitution only on the two matters that the defendant entered a plea of guilty to.*'

"Nevertheless, the Court then *ordered the Defendant to pay Kruse Insurance for the alleged insurance fraud count which had been dismissed.*"

"When defense counsel later brought a Rule 35 motion to modify the judgment to correct the restitution mistake, the Court denied the motion, and"

'The Court ruled that with regard to Kruse Insurance, in the event the defendant is ultimately placed on probation, the Court will hold a formal hearing at a later date to determine the exact amount owed to said Insurance Company. The Court further advised defendant that in the event the Recommendation Committee recommends the defendant be placed on probation, it will be a condition of his probation that he pay restitution to all victims who suffered monetary damages as a result of the defendant's conduct, or the court will relinquish jurisdiction in this matter.'

"The Court made it clear that no probation would be granted unless the Defendant paid the restitution. It said,"

'I hope you make it up there, I hope they recommend probation for you. If they do, we'll certainly bring you back, and then we'll have another little session on this restitution. But between now and then and after the Prosecutor submits his report, if you don't want—*if you feel like you don't want to pay those sums off, just simply advise your attorney of that and I'll relinquish jurisdiction.*'

"Mr. Russell later agreed to pay all victims in order to get probation."

'The Court on its own motion, moved to release the defendant from custody at this time, if the defendant was willing to post a $7,000.00 bond with the Bannock County Auditor, to be held in trust to show good faith on behalf of the defendant, indicating he will pay the restitution owing to the victims in this matter, once the total is determined by the Bannock County Prosecuting Attorney's Office.'

"B) STATEMENT OF FACTS RELATING TO EVIDENTIARY ERRORS."

"Defense counsel objected to the Court considering other criminal allegations which were dismissed or hearsay evidence relating to bad acts by the Defendant."

"Nevertheless, *the prosecution presented, and the court considered, many bare allegations before and during sentencing. For example, the prosecutor questioned the Defendant about stolen guns and stolen snowmobiles.* Defense counsel objected to using the information the Defendant had given to a police officer under a cooperation agreement to prejudice him at sentencing. *The Court allowed such questions.* The prosecutor made hearsay/opinion statements without presenting evidence, such as:"

'And there's a lot of other snowmobiles that he's obliterated.'

'I think that the serial numbers were altered as a pattern of criminal activity of stolen snowmobiles.'

'... and it's my understanding that he admitted those facts [relating to insurance fraud] to Sergeant Bunderson on the 24th of August.'

"Furthermore, the Court evidently considered the objectional statements in deter-

mining the sentence of Defendant, as evidenced by these statements:"

'... it appears to the Court that this is a much more serious matter than the nature of the offenses to which the defendant pled guilty to. He's admitted to having five snow-machines that he knew were stolen with altered serial numbers in Blackfoot.... And it looks to me that the presentence investigation report also indicates that this isn't just a simple case of altering serial numbers on snowmachines. They indicated there's a very disturbing pattern here that emerges and involves a theft of snowmobiles which were subsequently sold after the serial numbers had been altered.'

'... I want to emphasize again, there's much more, and the pre-sentence investigator indicates, there's much more than meets the eye here in this 'case, and people are entitled to have their property not taken from them, especially recreational property that does sit out and maybe it's more easy than other things to steal.'

'As far as I'm concerned, you've entered pleas of guilty to certain criminal conduct. As far as I'm concerned, you've also been engaged in other criminal activity that you didn't plead guilty to.'

**"C) STATEMENT OF FACTS RELATING TO REVOCATION OF DEFENDANT'S PROBATION."**

"Defendant was placed on a 180 day rider, after which he was returned to the District Court. On February 27, 1990, the hearing was held and *the Court placed Defendant on probation.*"

"At the hearing the Court also said:"

'Also, you will not contact your wife in any fashion. You will not go onto her premises into her dwelling without any exception.'

"However, the Defendant was granted permission by the court to go to the house to obtain clothing, a vehicle, and some personal items. After going to his home with his attorney [Wood], Defendant entered the home by breaking the doorjamb.[5]"

"To this point there was no written order of the District Court and the Defendant

---

5. Mr. Wood, with the permission of the prosecutor and the district court, testified at Russell's probation violation hearing:

MR. WOOD: Your Honor, my contact with Richard Russell began, of course, Tuesday when—he had come back Monday on the bus from Boise and Tuesday when we had the hearing before you to see if he could be put on probation after a 180–day rider. On that day we did come before you, you placed Richard on probation, and you imposed certain terms and conditions upon Richard for his probation. And there was some limitations with him seeing his wife or contacting her, and you even mentioned going to her house. At that time we indicated that we would like to be able to go up there to get the vehicles and clothing and personal effects, and we asked if it would be all right if we did so, if Richard did so with another adult present or a police officer or somebody from Probation and Parole, and that was deemed to be acceptable.

At that time we did not tell the Court that there was a temporary restraining order or any other that prevented Richard from going to the house because, frankly, it didn't enter my mind at the time. I was aware, I guess, on the surface of my mind that there was a joint preliminary injunction that prevented him from harassing her in any way, but it did not enter my mind that there was another order that did, in fact, say that he should not go to the residence that was occupied by her. As a result, you ordered that Mr. Russell could go over to my office, from court directly to my office, and he was to go over to Probation and Parole immediately when I was done with him.

We went to my office, we did some discussions about the divorce trial that was set for the next day. While we were sitting there my secretary brought in an envelope and handed it to Richard and said, 'Tony said to give this to you.' I asked Richard, 'What's that?' Richard said, 'It's the keys to the house.' I thought he meant that it was the keys to his Mink Creek house, when, in fact, I later found out after all this took place it was the keys to Tony's house. Tony was going to work and wasn't going to be at the house.

Richard didn't have any way to get to Probation and Parole and then home from there after they finished with him, so we called Randy Kline's office and he was out. They said he was at the courthouse, he would be back in a few minutes. I asked them to have him call me. We then did some more work on the divorce. We called Randy Kline's office again and he had not been back yet.

I then called Probation and Parole and talked to Mark Branson, discussed with him the possibility of us going up to the house and

getting the car, and all during this time I thought there were keys to the house in Richard's custody, in his possession. We got the okay from Mark to go up, and so we left.

I drove my car up and took him up there. We arrived at the residence, went up to the garage area, and there's a little box on the side of the garage with push buttons on it and number on it, and Richard tried a number of times to work those numbers. Evidently it was a combination type lock that would open the garage door if the right combination was used on it. While he was doing that and being unsuccessful, he said something to the effect that she must have changed the combination. He then reached just right next door, the little box was right here (indicating) and just to his left was the individual door to the garage, and he jiggled the door knob and leaned against it and hit it with his hip and it opened, and we saw that it had broken the doorjamb. And he said at that time, 'I didn't mean to do that.'

We went in, he pushed the garage door opener, and the big overhead doors came up. We were just looking at the broken doorjamb when Randy Kline showed up. Randy came out, and said something to the effect that there's a restraining order that prevents you from being up here. I told him what, well, I didn't read it that way, because, again, I was thinking of the preliminary injunction that only prevented the harassment of Mrs. Russell. He said, 'Well, I'll see you in court tomorrow for a contempt hearing,' and he got back in his car. I walked out to him and I said, 'Randy, I want to talk to you for a minute. All we're up here to do is get the car, some clothing and things of that sort. We're not here to cause any trouble. We've talked to the Judge and to Probation and Parole about being up here. If you want to come inside with us and go along with us and make sure we don't take anything, you're welcome to do that.'

Randy got out of his car, went into the house with us. Richard had already gone into the house, he was upstairs in the kitchen. We went up into the kitchen and he was looking through the cupboards trying to find the key to the truck. He couldn't find it. He looked in various other places in the house that he thought they may be, making some comment about the fact that maybe his wife had hidden the keys.

After unsuccessfully finding—not finding the keys, we asked Randy if he could call Dorothy and ask her where the keys were. He did call Dorothy and she told him where the keys were. And we went upstairs into the small bedroom and looked through many keys that she had taken from all around the house and placed on some cookie sheets in that room.

Richard picked up the keys to what he thought were the keys to the Thunderbird and the keys to the GMC truck and keys to the Island Park property, and we went downstairs and outside into the garage again where he attempted to open the Thunderbird, but it was evidently the wrong key. He was looking down at the oil under the Thunderbird. Evidently some transmission fluid had been leaking there. And Randy was making statements like, 'To me this is breaking and entering. It's wrong, and you might have to answer criminally for this.'

Richard got up and called Randy a pimp. It was tense feelings between them for a minute. That was the worst he called him. I said, 'Well, let's go on.' We went back into the house and went back to where the keys were and tried to find the correct set to the Thunderbird and were unable to do it.

Richard went into another bedroom, we followed him. He found his eyeglasses. He also took a card for his railroad annuity. And he picked up a small dictionary book that was about three inches by four inches.

We then went back out and started up the GMC truck, went back into the house, got hammer and nails, came back out to the garage, repaired the doorjamb. Richard went back in, got a screw driver, came out and picked up the striker plate with the screws and he put the striker plate back into the doorjamb.

I mentioned to Randy at the time, 'If you want to call your client to see if it's all right to take these other keys or this book and so forth, maybe you should.' He didn't want to, he didn't call her. So we locked the door, went outside, and Richard closed the garage door and it closed, and we drove off.

That was the incident that took place up there. Randy was very angry. He attempted a second phone call right after he had called Dorothy to get her permission to get the keys, and I don't know when he tried to call, but evidently it rang and there was no answer and he hung up.

I feel, Your Honor, some responsibility myself in the case. I think that if I had been more careful myself, I would have contacted Judge White before we went up to the house and either advised him or obtained his consent as long as Dorothy wasn't there to go get the vehicle.

I also blame myself somewhat for not recalling the actual temporary restraining order and the specific terms of that, but it honestly never came to my mind that that was there or that was an impediment to doing something that we thought was an innocent action.

. . . .

I myself saw Richard write a note of apology to Dorothy and read it over his shoulder.

We have felt all along that the attempts of plaintiff's counsel in the divorce case were to make Richard look as bad as possible, to do everything they could to cause problems for him. I do resent the fact that he ex parte called this Court and went into this item causing this problem.

. . . .

had not been signed up with the Probation office."

"Defendant's wife [Dorothy] was suing him for divorce at the time, and her attorney contacted the District Court Judge and advised him of the "break-in", whereon the Judge contacted Probation and Parole and asked for a report. Upon receipt of the report, the Judge issued a Bench Warrant for the arrest of Defendant."

"After his arrest, Defendant denied that he had violated his probation and a hearing was held on March 2, 1990."

Your Honor, it's my feeling that this more appropriately might have been handled through the Probation and Parole and their authority to impose up to 90 days jail time upon Mr. Russell for perhaps activities that they don't deem serious enough for actual probation violation hearings, because if there is a violation here at all today, it is an extremely technical violation.

We're not here because Mr. Russell went up to his own house and went in there against the restraining order. That particular issue can be met and addressed by the divorce court. I don't think there's anything in the orders that Mr. Russell was given either by this Court or by Probation and Parole that would have prevented that type of activity.

I think what we're here on as the basis for the probation violations is the phone call that Mr. Martinez made to Mrs. Russell. Now, Mr. Russell did not contact her. Mr. Martinez did. That's perhaps being as technical one way as the State is being technical the other way. But, Your Honor, I feel it would be a travesty of justice in this man's life to revoke his probation for such an act and to send him back for five years imprisonment for having another person call somebody else and ask if she would like to speak to Richard. There is no harassment. There is a bona fide reason for it. It's true that it was thoughtless, but in his mind it was something that needed to be addressed.

Your Honor, we would ask that the Court find him not in violation, that the Court grant to Probation and Parole the right, if they see necessary, to impose jail time upon him at their discretion, but that he not have his probation revoked.

. . . .

MR. HIEDEMAN: I think Mr. Wood is correct when he calls this a technical violation. I think maybe Mr. Russell wasn't aware of what the Court meant. Maybe he did forget the prior court order and maybe he didn't understand what Mark Branson meant when he told him no contact.

The problem that the State has with the case is it's been fraught with problems. For al-

"Defendant's estranged wife testified that Mr. Martinez [Russell's stepfather] telephoned her and said the Defendant would like to talk to her."

'A. He called, he said, "Richard would like to talk to you." And I indicated to him at that time, I said, "Why didn't he contact me or talk to me before they decided to break into my house yesterday?" Tony said, "I don't know about that." I said, "Then I suggest you ask him about that." He said, "All he wants to talk to you about is your taxes." And

most two years now we've been dealing with Mr. Russell, attempted probation at one time, wasn't successful, the Court ended up suspending the sentence—revoking the withheld judgment and suspending the sentence and sending him to Cottonwood.

The problem that the State has, he gets back and the first day he's right back into problems.

I have talked with Probation and Parole about it. They're I think, also concerned, obviously, from Mr. Russell's past and the accusations he's made toward probation officers and conversations that he's had with Wally Peterson and Mr. Branson, I think they're concerned, also, whether or not he will be able to make probation. I will tell the Court that their recommendation is that he be placed on the electronic monitoring device. We do have one active in Bannock County now. It's a very recent development in the area of probation. Mr. Newman feels it's appropriate for Mr. Russell.

. . . .

MR. WOOD: Your Honor, I'll basically stand on what I argued previously to the Court. I would beg the Court not to revoke his probation. If, in fact, the Court sees fit to keep him here and allow him to continue on probation, then he should and will comply with any requirements of Probation and Parole, even it it's electronic monitoring.

I think that there are many cases—well, many considerations that have gone into this case over and above his actual conviction. He was convicted of altering and obliterating serial numbers on two snowmachines. That's only part of what he's been punished for, of course, because he has admitted other wrongdoings and he has made reimbursement to the Court. He has spent over eight months in jail. He has come back now at this time, and I don't think that he intentionally was trying to violate any orders or that he was trying to disregard authority figures by having Tony Martinez call. If he was trying to intentionally violate those orders, he would have called Dorothy directly.

Tr. 293–306.

I said, "I suggest he call and talk to the attorneys about it, then," and I hung up.'

'Q. That was the extent of the whole conversation?'

'A. That was the extent of the phone call.'

"The Defendant's wife was not upset about Tony Martinez calling her."

'Q. (By Mr. Wood) Why was it that this telephone call upset you, or did it?'

'A. I didn't say it had, no.'

'Q. You were upset, instead, incident that happened earlier at the house?'

'A. Definitely.'

"Tony Martinez, the Defendant's step-father, had telephoned Mrs. Russell, the Defendant's wife, on many other occasions as a go-between. She testified as follows:"

'Q. Have you spoken with Tony Martinez on previous occasions about various things concerning you and Richard?'

'A. Tony has called me on several occasions concerning things that Richard has asked him to ask me about.'

"Mr. Martinez testified as follows:"

'Q. Had you called Dorothy before on behalf of Richard?'

'A. Yeah, previously before, yes.'

'Q. Had she objected at any other time that you had called her?'

'A. No, no, we have always talked, you know, we have been friends for 30 years, you know.'

"The Defendant also testified:"

'A. Well, my friend Tony has been the go-between between myself and my wife for these past nine months. And to me the question of what was the matter with *my pickup because it was totally unsafe to drive, whether it had insurance or not,* and I had one other—oh, *if she could find the receipts where I had paid the court ordered fines and restitution,* to me those were very important items, and he's always been able to be the go-between between us without creating any hard feelings.'

"The Court found that '... the Defendant is in violation of his probation, specifically the Court order regarding having no contact with his wife.' The Court said,"

'And the Court does find the defendant to be in violation of his probation for violating the specific order that he was not to contact or make any effort to contact his wife. That was a direct order from this Court. The court finds by a preponderance of the evidence the fact that Mr. Martinez called the wife, the Court finds that he was simply a conduit of Mr. Russell, he did so at Mr. Russell's request.'

"D) STATEMENT OF FACTS RELATING TO THE COURT'S CHANGE OF SENTENCE."

"On September 12, 1988, the Defendant was sentenced to 'a minimum term without the possibility of parole or good time of two years, plus an additional term of three years indeterminate sentence' on Count I, and a like sentence on Count II, to run concurrently. The Court also ordered Defendant to pay restitution to Royal Insurance Company, Kruse Insurance Company, and Mr. & Mrs. Alvin Knudsen, plus $20.00 to the State of Idaho Victim's Compensation Fund and $16.50 court costs."

"On December 19, 1988, the court required as a term of Defendant's probation for him to pay $750 to the Idaho State Police, $1,200 as costs of prosecution, plus the $20 Victim's Fund and $16.50 costs."

"On August 11, 1989, without advance notice, the Court changed the sentence to three years fixed on Count I, and three years indeterminate on Count II, to run consecutively."

"The basis for the change by the court was that the crimes committed by Defendant occurred prior to February 1, 1987, when the Unified Sentencing Law was adopted. NOTE, however, that the information was amended at the arraignment to allege that one of the crimes occurred on March 3, 1987. [NOTE FURTHER, that the Minute Entry and Order dated 20 June 1988 incorrectly has the date as March 7, 1988."

## ISSUES

1. Did the trial court Defendant to pay restitution on criminal charges which were dismissed?

2. Did the trial court err in receiving and considering in the sentencing of the Defendant the comments of the Prosecuting Attorney which were unsupported by testimony or evidence?

3. Did the trial court err in re-sentencing the Defendant?

4. Did the trial court err in revoking the probation of the Defendant?

## ARGUMENT

"1. THE TRIAL COURT ERRED IN REQUIRING DEFENDANT TO PAY RESTITUTION ON CRIMINAL CHARGES WHICH WERE DISMISSED."

"Idaho Criminal Rule 33(d) prohibits as a condition of probation 'any requirements of the contribution of money or property to any charity or other non-governmental organization.' "

"The District Court first determined that it could only order restitution on the two matters that the defendant pled guilty to. The Court specifically therein said '... *the Court has no power to order this defendant to pay restitution on charges that were dismissed by the Prosecuting Attorney's Office.*' "

"Nevertheless, the Court then promptly proceeded to order the Defendant to pay the disputed debt on a dismissed charge, that being the Kruse Insurance restitution. When this was brought to the Court's attention in a Rule 35 motion the Court refused to modify the sentence and sternly informed the Defendant that his potential probation would depend upon him paying 'restitution to all victims who suffered monetary damages as a result of the defendant's conduct, or the court will relinquish jurisdiction in this matter.' (emphasis added)"

"The defendant had pleaded not guilty to all charges brought against him. *The State dismissed all but two charges relating to obliterating vehicle serial numbers.* There was no plea bargain relating to restitution. If the Defendant had been required to go to trial on the charges which were dismissed, and had been found not guilty, he would not have had to pay restitution. Dismissal is akin to acquittal. It is therefore totally unjust to punish him for suspected but unproven (and dismissed) crimes. Defense counsel argued this point to the trial court."

"*Restitution may be a valid issue in plea negotiations, but it is not proper to accept a defendant's plea after negotiation and then argue that he cannot have probation without paying restitution for every crime of which he is suspected.*"

"The Defendant agreed to cooperate with the police as part of his plea agreement. Then when he revealed the information they sought, and admitted to some involvement in illegal activities, the prosecution sought to require restitution on those activities. That kind of action on the part of the prosecution does not provide much incentive to a Defendant to fully cooperate! The police officer with whom the Defendant spoke admitted that the information used against the defendant admitted that the in the sentencing came from conversations he had with the Defendant: 'Q. And did this conversation with Mr. Russell take place as part of an agreement whereby he would agree to clear up some matters concerning thefts and other criminal activities?' 'A. Yes.' "

"Restitution became a bitter issue in this case. The Defendant denied wrongdoing, for example, in the alleged insurance fraud. But the Court saw his reluctance to pay restitution as an indication of a bad attitude, and with the Defendant having a 'bad attitude,' the Court would not grant probation. *When the Defendant relented, and agreed to pay all 'victims,' the Court granted probation.* If in fact the Defendant was innocent of insurance fraud, the Court's action surely could do nothing but create a bad attitude in the Defendant toward the 'justice' he was having to swallow."

"2. THE COURT ERRED IN RECEIVING AND CONSIDERING IN THE SENTENCING OF THE DEFENDANT THE COMMENTS OF THE PROSECUTING ATTORNEY WHICH ARE UNSUPPORTED BY TESTIMONY OR OTHER EVIDENCE."

"The Idaho Judges Sentencing Manual, at page 605, states:"

'The evidence that may be received at a hearing in aggravation or mitigation is restricted by the provisions of Idaho Code § 19–2516. This section provides:'

> 'The circumstances must be presented by the testimony of witnesses examined in open court, except that when a witness is so sick or infirm as to be unable to attend, his deposition may be taken by a magistrate of the county, out of court, upon such notice to the adverse party as the court may direct. No affidavit or testimony, or representation of any kind, verbal or written, can be offered to or received by the court, or a judge thereof, in aggravation or mitigation of the punishment, except as provided in this and the preceding section.'

'If either the prosecution or the defendant insist, the court may not receive any evidence in violation of this section of the code. That means that all evidence must be in the form of live testimony with an opportunity for cross examination, except non-oral testimony in the form of a written pre-sentence investigation report (*State v. Creech,* 105 Idaho 362 [670 P.2d 463], 1983.)'

"Some of the adverse information used by the Judge in the sentencing of the Defendant was of course obtained from the pre-sentence investigation report. But the prosecuting attorney was wrongfully allowed to make opinion statements over the Defendant's objections."

> 'And there's a lot of other snowmobiles that he's obliterated ...'

> 'I would still like to ask about the five snowmobiles in Blackfoot because I think that these two things that he's pled guilty to have to be placed in a pattern. I think the Court has to understand what the significance of his actions were to obliterate the numbers on those snowmobiles.'

"The prosecutor thereafter attempted to use against the Defendant the very information he gave the police pursuant to his cooperation agreement. The Defense objected,"

> 'MR WOOD: Excuse me, Your Honor. I'm going to object to this line of questioning on the basis that he's not charged with things relating to this, this [sic—it's] part of his cooperation agreement that he has revealed these things, and I think it's improper for the prosecution at this point to try to prejudice the case against him by him doing what they have asked him to do.'

"The court, however, allowed questioning on these things. The Defense again objected,"

> 'MR. WOOD: Your Honor, if there's going to be evidence presented here today, I want it to be presented and us have a chance to cross-examine on it. I don't want a conclusionary statement to be given by the prosecution about what he did or didn't do.'

"The prosecutor thereafter continued to present hearsay/opinion statements:"

> 'MR. ODDO: ... Like I said, he met with one investigator and didn't tell him about the five snowmobiles and then met with Sergeant Bunderson the week after that and basically had to have it dragged out of him after Sergeant Bunderson already got information about those five snowmobiles from a different source. I don't know if that sounds to me like cooperation. Yeah, he agreed to show them the five snowmobiles, but after he was confronted.

> 'THE DEFENDANT: I object on that.

> 'MR. WOOD: Likewise, Your Honor.

> 'THE COURT: I'm going to take a short recess ...'

> ....

> 'MR. ODDO: Just a couple of questions, Your Honor—well, I don't know if the Court ruled about whether or not I could ask him questions about the snowmobiles that he had in Blackfoot and whether or not the were—the serial numbers were obliterated on them.

> 'THE COURT: You may ask that question.

> ....

> 'MR. ODDO: ... His son-in-law, who was kind of cooperating with him in these ventures, did some time in the Ida-

ho Department of Corrections, it was on a rider, and I think that this individual should get at least that much time.'

"3. THE TRIAL COURT ERRED IN RE-SENTENCING THE DEFENDANT."

"It appears that one of the crimes to which the Defendant pleaded guilty occurred prior to February 1, 1987, and the other crime occurred after that date. This means that the unified sentencing act of Idaho applies to one crime but not to the other."

"The Court evidently overlooked the amendment to the complaint showing the date of the crime to be March 3, 1987."

"The Idaho Judges Sentencing Manual, at page 717, says"

'Prior to the amendments and repeals of statutes effective February 1, 1987, I.C. Sec. 19–2513 and 19–2513A provided for the imposition of either an indeterminate sentence or an alternative fixed term sentence. Although these statutes are not in the current code volumes, they will still apply to offenses committed prior to February 1, 1987.'

"Although it is not considered as a sentencing alternative, the court always has the jurisdiction to correct an illegal sentence. [Rule 35, I.C.R.]"

"However, the troubling thing about the District Court's action in resentencing the Defendant was that *the fixed term was increased from two years to three years, and the sentence went from concurrent to consecutive.*"

"In addition, the Court added $750 payable to the Idaho State Police, and $1,200 payable to the County as costs of prosecution."

"It sounded to the Defendant like *increased punishment for the violation of his probation, instead of merely imposing the previous sentence.*"

"4. THE TRIAL COURT ERRED IN RE-VOKING THE PROBATION OF THE DEFENDANT."

"A sentence imposed within the discretion of the trial court will not be disturbed by the Idaho Supreme Court in the absence of abuse of discretion. *State v. Dunn*, 91 Idaho 870, 876 [434 P.2d 88] (1967)."

"The defendant has the burden of showing a clear abuse of discretion on appeal. *State v. Chapa*, 98 Idaho 54 [558 P.2d 83] (1976); *State v. Rice*, 99 Idaho 752 [588 P.2d 951] (1979)."

'The terms and conditions of probation must be contained in a written order granting probation. *Ex parte Medley*, 73 Idaho 474, 480 [253 P.2d 794] (1953). If the terms of probation are only stated orally, then there is a serious question as to whether they can be enforced.' (Idaho Judges Sentencing Manual, p. 815)

"There was no written order granting probation in this case at the time the Defendant supposedly violated the Court order. Although the Order was dated February 26, 1990, that is most certainly an error, because the hearing was not held until February 27, 1990. It is possible that the Order was signed prior to the morning of February 28, 1990, when the alleged violation took place, but it is certain that neither Defendant or his counsel had a copy of it by that time. Thus, the Defendant was left to his own memory and impression as to what the Court had ordered."

"Likewise, Probation and Parole had not signed him into their program and there were no written instructions for him to follow, nor a probation agreement."

'*Conditions imposed by the court should be designed to assist the probationer in leading a law abiding life. They should be reasonably related to his rehabilitation and not unduly restrictive of his liberty or incompatible with his freedom of religion. They should not be so vague or ambiguous as to give no real guidance.' ABA Standards Relating to Probation*, Section 3.2(b).

"It is submitted by Defendant that the Court's order is both unduly restrictive (as interpreted by the Court) and ambiguous. The Court said at the hearing,"

'Also, you will not contact your wife in any fashion. You will not go onto her premises or into her dwelling without exception.'

"The Court in it's mind evidently meant that the Defendant not only was to refrain himself from 'contacting' his wife, but he was also not to 'contact' her through any other person. This was not stated by the court, however. The court also did not explain that 'not more than merely physically staying out of her sight ... it contact your wife' meant staying away from her, or also meant to not telephone her through another person. The Defendant was evidently expected to understand that he could contact his wife through his attorney, but not through his step-father (who had been doing the telephoning between them for nine months). The Court may but the wording have meant it's order to be comprehensive, under the circumstances was ambiguous. The judge spoke one sentence of ten words, then went on to talk about not going to the premises of the wife, and then granted the Defendant permission to go to the premises on certain conditions. Even the judge was unclear on exactly what he had ordered. He revoked the probation the Defendant on the grounds 'that he was not to contact his wife or make any effort to contact his wife.' In fact, there was NO language in the order preventing the Defendant from 'making an effort' to contact his wife. The Prosecutor also evidently misunderstood what the Court had verbally ordered, and thought an ATTEMPT was enough for a violation, because that is how he couched his question to Defendant's wife ... 'Has he attempted to contact you in the past week?' Is it any wonder that the Defendant was unclear as to what had been said or meant? *The prosecutor admits that the Defendant probably did not understand."*

'I think Mr. Wood is correct when he calls this a technical violation. I think maybe Mr. Russell wasn't aware of what the court meant. Maybe he did forget the prior court order and maybe he didn't understand what Mark Branson meant when he told him no contact.'

"The judge said the following in the revocation hearing:"

'When you fellows asked if he could go up and get some of his belongings, I said he could so long as he had another responsible adult. I assumed his wife would be home, I certainly didn't assume that he would break in.'

"Doesn't it strike one as a little inconsistent that it was OK with the Judge that the Defendant go with a third person to the home while the wife was there, but that it was not OK to have a third party merely call her to see if she would talk to the Defendant about legitimate questions? Would the Defendant have violated his probation if he had talked to his wife while at the home? Or if he had asked the third party to talk to her? Just what was the judge trying to accomplish with his order? Why was he so upset about the telephone call, when the wife herself was not? The Defendant could well have understood the comments of the Judge as ordering him not to harass his wife, and that he should use a third party to insure that that did not happen ... which is precisely what he did in having his step-father telephone her, as had been the practice for months."

"In *CRIMINAL PROCEDURE*, Vol. 3, a Criminal Practice Series published by West Publishing Company in 1984, under the heading 'Revocation of Probation,' at page 154, is stated:"

'(a) Basis for Revocation. Unquestionably "probation may not be revoked in the absence of a threshold determination that there has been a 'violation' of the express conditions of probation, or of a condition so clearly implied that a probationer, in fairness, can be said to have notice of it." As the Supreme Court concluded in *Douglas v. Buder* [412 U.S. 430, 93 S.Ct. 2199, 37 L.Ed.2d 52 (1973)], this is a requirement of due process.'

"The book further states at page 156:"

'Once it has been determined that an intentional or inexcusable violation of a probation condition has occurred prior to the conclusion of the probation period, there remains another important question to be resolved: "What appropriate

action should be taken by the court in light of the violation." In particular, "the court must then consider whether reconfinement or some less drastic alternative is the best solution to both protect society and improve the defendant's chances of rehabilitation." * * * However, "revocation should be used only as a last resort when treatment has failed." ' (citations omitted)

*"It is Defendant's contention in this appeal that: First, the terms of the probation as ordered by the Court were not sufficiently explicit to give Defendant notice of what was required of him, and Second, even if he is guilty of violating the terms of probation, the sentence is too harsh under the circumstances."*

"The Idaho Supreme Court has said that the primary consideration in determining whether probation should be granted is 'the good order and protection of society. All other factors are, and must be subservient to that end.' *State v. Moore*, 78 Idaho 359, 363 (1956), 304 P.2d 1101, and *State v. Moore*, 93 Idaho 14, 17 [454 P.2d 51] (1969)."

"The same standard should apply to the question of whether probation should be continued. In this case the action of Defendant did nothing to threaten the 'good order and protection of society.' In fact, his action in having another person telephone his wife was for the purpose of preserving good order."

"In determining whether to grant or deny probation, the court must consider the factors set forth in Idaho Code § 19-2521 which provides as follows:"

'19-2521. (Enacted as 19-2520, however compilers changed to Section 19-2521 since there was an existing 19-2520,)

CRITERIA FOR PLACING DEFENDANT ON PROBATION OR IMPOSING IMPRISONMENT. (1) The court shall deal with a person who has been convicted of a crime without imposing sentence of imprisonment unless, having regard to the nature and circumstances of the crime and the history, character and condition of the defendant, it is of the opinion that imprisonment is appropriate for protection of the public because:

(a) there is undue risk that during the period of a suspended sentence or probation the defendant will commit another crime; or

(b) the defendant is in need of correctional treatment that can be provided most effectively by his commitment to an institution; or

(c) A lesser sentence will depreciate the seriousness of the defendant's crime; or

(d) imprisonment will provide appropriate punishment and deterrent to the defendant; or

(e) imprisonment will provide an appropriate deterrent for other persons in the community; or

(f) the defendant is a multiple offender or professional criminal.'

"This code section expresses a preference for dealing with convicted criminals without imposing terms of imprisonment unless it is 'appropriate for the protection of the public.' "

'Again, the Idaho Judges Sentencing Manual, page 800, states:'

*'Should probation be Granted?*

'Probation is important to the state and the defendant and is a desirable disposition in appropriate cases because;

'(I) It maximizes liberty of the individual while at the same time vindicating the authority of the law and effectively protecting the public from further violations of law;

'(II) It affirmatively promotes the rehabilitation of the offender by continuing normal community contracts;

'(III) It avoids the negative and frequently stultifying effects of confinement which often severely and unnecessarily complicate the reintegration of the offender into the community;

'(IV) It greatly reduces the financial cost to the public treasury of an effective correction system;

'(V) It minimizes the impact of the conviction upon innocent dependents of the offender.'

"In reviewing whether there has been an abuse of discretion in sentencing, the Su-

preme Court will look at all of the circumstances of the case, and if it determines that the sentence is 'unduly harsh' it may order the sentence modified. *State v. Ross*, 92 Idaho 709, 718 [449 P.2d 369] (1968); *State v. Adair*, 99 Idaho 703 [587 P.2d 1238] (1978)."

"Three years in prison, followed by three years indeterminate, *for having his stepfather call his wife?* The sentence may not be unduly harsh for the crimes the Defendant committed, but the revocation of his probation is unduly harsh as a result of such an inconsequential act."

"Under all of the foregoing standards, the Defendant should remain on probation."

"It must be made clear that the ground for revoking Defendant's probation was NOT the 'break-in' to his home to get his clothes and vehicle. Nor was it because he disobeyed the verbal order of the probation officer (he had not yet been signed up by the probation and parole office.) *The sole basis for the revocation was that, in the mind of the District Judge, the Defendant had disobeyed a verbal order of the court not to contact his wife.* Nevertheless, it is clear from the record that not only the Defendant's wife and her divorce attorney were upset by, the 'break-in,' but so was the Judge. Defendant suspects [reasons] that the Judge's unusual upset over the innocent telephone call was actually based upon the 'break-in' issue. That, with the following enumerated items, tends to show the Judge's antipathy toward the Defendant and the basis for an abuse of discretion. Consider the following:"

'1. The Judge heard testimony that the Defendant had referred to him as "a bigger fucking crook than I am."

2. The judge had received hearsay evidence about other reported criminal activity of the Defendant, and talked as if all of it were true.

3. The Judge had required Defendant to pay restitution to ALL potential victims, including those relating to the dismissed criminal charges, being aware that the Defendant had received a settlement from the railroad for his disability.

4. The Judge had information from the jailers that the Defendant had threatened to sue the County and confronted Defendant about it.

5. The judge had commented previously about the "Bad Attitude" of the Defendant, in a threatening way (until the Defendant agreed to pay restitution to ALL victims.):'

'What I'm talking about is attitude as far as probation and rehabilitation. I think a person has a much better success rate on probation if you're willing to be repentant and totally and completely honest and forthright. And I hope I'm getting through to you.

'THE DEFENDANT: Yes.

'THE COURT: In other words, I really would like to change this sentence, I would really like to see you on probation, sir, but I just in good conscience can't do it unless you're willing—to just put it real bluntly, you're not willing to do that, then you're going to be on the bus [to prison] in the morning.

'THE COURT: Mr. Russell, if you want to keep nitpicking me, you'll be on the bus in the morning.

'THE COURT: So you're going to have to pay these damages if you want to be put on probation. And if you don't want to, we might as well find out now and you might as well get on the bus in the morning.

'THE COURT: Mr. Wood, we'll proceed with the hearing. The Court is somewhat chagrined where an individual who steals comes into court and complains that he's being asked to pay for things that may have been damaged and that the price wasn't right when they were resold. I haven't yet, Mr. Russell, decided to place you on probation. I think you have an attitude problem.

'THE COURT: And I might add, Mr. Russell, since you've had an apparent change of attitude or change of heart on paying these sums, I'm going to reduce the other terms and conditions regarding monetary matters that I was kind of figuring on giving you before,

so I want you to know by agreeing to do this, which I think you're doing the right thing, I'm going to save you some money in other areas. [After which the Judge added $750, plus $1,200, to Defendant's payments previously ordered.]

'THE COURT: How does anybody know in this courtroom, Mr. Russell, that we're not just getting a big fat con job from you right now? You've been one of the most resentful defiant people that I've ever seen on probation in my life.

'And I've never ever, Mr. Russell, seen a person with a worse attitude in all my years of experience first as a public defender and then as a district judge, never. * * * But I have never seen anybody, Mr. Russell, with the attitude that you've exhibited, never, and I can't emphasize that strong enough. (After which the Judge changed Defendant's sentence to more years and from concurrent to consecutive.)

'I've told you earlier, you have the worst attitude of anybody I've ever seen in a criminal case.

'6. The Judge received ex parte communication from the adverse divorce attorney about the 'break-in' incident.

7. Consequently, the Judge ordered an investigation based on the 'break-in' incident (instead of letting the civil court handle it). [Note that the investigation was ordered BEFORE any telephone call had been made.]

8. The Judge issued the bench warrant and instituted the probation violation proceedings himself. Probation and parole did not institute the action, and did not seek revocation, but rather that the Defendant be placed on the electronic monitoring device.

9. The Judge had granted Probation and Parole the right to incarcerate the Defendant up to 90 days in the county jail for minor violations. But the Judge did not allow this kind of action by Probation and Parole, preferring instead to take the matter from their hands and entirely revoke probation.'

"The District Court was unreasonable in revoking the probation of the Defendant under the circumstances, and possibly did so based not upon the so-called violation, but based upon the previous dealings, impressions, conclusions, and the attitude of the Judge toward the Defendant."

CONCLUSION

The relief sought by the Defendant is as follows:

1. Reversal of the Order to pay reimbursement to any person or entity but those directly affected by the crimes to which Defendant Pleaded guilty, and an Order requiring the Court or County to restore the appropriate funds to the Defendant.

2. A re-sentencing in accordance with the appropriate laws, not to exceed that originally given to Defendant, to be served concurrently, and reversing the addition of $750 to the Idaho State Police and $1,200 to the county for costs of prosecution.

3. Most importantly, reversal of the order revoking the Defendant's probation, and judgment Court to grant probation with conditions directing the as reasonably necessary to protect society and to allow rehabilitation of the Defendant, or for the Supreme Court to order modification of the sentence as appropriate under the circumstances.

The State's responsive brief, filed in this Court, suggests that the court proceedings were *fraught with problems* relative to the State's confession of court error in sentencing Russell:

*F. The Unified Sentencing Act Should Have Been Applied to Count II and the Oral Sentence Varies From the Written Judgment; Thus, Russell Must Be Resentenced and/or the Clerical Error Corrected*

When Russell was first sentenced, the district court did so under the belief that the Unified Sentencing Act applied to both counts. The court imposed sentences with fixed and indeterminate por-

tions. Later, the court observed that the information alleged that the crimes occurred in 1986, before the effective date of the Unified Sentencing Act, and the court resentenced Russell under the prior law. For the first time on appeal, Russell points out that during the guilty plea, Count II of the information was deemed amended to allege a date of March 3, 1987. The Unified Sentencing Act thus applies to this count. Russell points out that his indeterminate three year sentence thus does not comply with the Act. Although this issue has not been raised in the trial court, the state agrees that Russell will have to be resentenced so that the sentence complies with the Unified Sentencing Act.

It is possible that Russell would have to be resentenced on only Count II, but in imposing sentence in August, 1989, it is clear that the court structured the sentence based on the belief that the Unified Sentencing Act applied to neither count. Depending on how the court resentences Russell on Count II, it may desire to adjust Count I to maintain the desired structure of sentence.

The state further notes that in pronouncing sentence, the court stated that the sentence on each count would run consecutively. The written order, on the other hand, stated that the sentences run concurrently. This variance between the oral and the written sentences will also need to be corrected.

The state will contact the prosecutor to determine whether these matters can be corrected during the pendency of this appeal.

In a larger sense, however, the better assessment would be that the entire proceeding from start to finish was *fraught with frustration,* suffered and endured primarily by the trial judge and the trial defendant. That is said upon an understanding readily gleaned from the briefs of respective counsel. The State is to be commended for conceding error in the one respect above mentioned, and likewise for its straight forward presentation. It carefully avoided bringing in any more controversy than there already was; yet, at the same time, it sought in moderation to uphold the rulings of the trial court. The State, of course, had no reason to be unduly excited, inasmuch as it had prevailed and was the respondent, generally a most favorable position. Understandably, the State, although it came to grips with the unalterable fact that the aforesaid error was permanently in the record, it advocated that remedial steps be taken in the district court, notwithstanding that the litigation wound its way to this Court for final determination.

With the State at this late date conceding error, the cause, according to the majority opinion, nevertheless will not be remanded—which the State thinks to be the proper procedure, and the litigation thereby terminated. If that be proper procedure, which is much doubted, then I am reminded of a two-justice dissent which enhances that doubt:

[T]he majority's decision today is only the conclusion of round one of appellant's case. Round two will be an action under the Uniform Post Conviction Procedures Act., I.C. § 19–4901 et seq. on the ground that appellant's constitutional rights were violated because of the due process argument and on the ground of competency of counsel for failure to assign as error the obvious defect in this case. If round two proves unfruitful for the defendant, then round three will be a petition in the federal courts under 28 U.S.C.A. § 2254 to set aside the conviction. State courts often bemoan the intervention of the federal courts in state cases, but so long as highly prejudicial errors, such as the admission into evidence of the statement, allegedly made by appellant's husband, remain uncorrected in state courts it is probably a good thing that federal courts are available to correct such mistakes.

*State v. Swenor,* 96 Idaho 327, 334, 528 P.2d 671, 688 (1974).

### EPILOGUE

It is possible to make a mountain out of a molehill. As a child, I thought otherwise, but today I have been to that mountain. It

is made of component parts, the first part of which appears near the close of the majority opinion where it acknowledges the defense contention "that there was inadequate proof that defendant requested his stepfather to phone his wife" which contention was supposedly knocked asunder by relating the testimony of Dorothy Russell:

He [Russell's stepfather] called, he said, "Richard would like to talk to you." And I indicated to him at that time, I said, "Why didn't he contact me or talk to me before they decided to break into my house yesterday?" Tony said, "I don't know about that." I said, "Then I suggest you ask him about that." He said, "All he wants to talk to you about is your taxes." And I said, "I suggest he call and talk to the attorneys about it, then," and I hung up.

If it were possible, I would prevail upon former Justice Huntley to write a sequel to his "The Rape of the Sabine Woman," *Curl v. Curl*, 115 Idaho 997, 1003–04, 772 P.2d 204, 210–11 (1989), if only I can suggest an eye-catching title and a delightful dialogue. One title comes readily to mind: "Much Ado About Nothing," and the script could be constructed around a knave so naive and oblivious that, although told by authority to not contact his wife obeyed that instruction, but asked an older gentleman, one who had always been on good terms with the wife, to make a telephone call to her, which would inquire of her as to the whereabouts of some insurance papers. The wife, despite the good relationship with the older gentleman, was brutally short with him, abruptly ended the telephone call with the click of the disconnect.

What may appear as deplorable to other appellate practitioners is that not a scintilla of a scent surfaces in the majority opinion regarding the content of the excellent brief prepared by defense counsel. The majority's response thereto is to ignore it. Defense counsel is not the only attorney deserving of accolades; likewise, Mr. Hiedeman is commended for fearlessly agreeing with defense counsel relative to the latter's thorough portrayal of the events which occurred when client and counsel accepted the district court's grant of permission to go to "his and Dorothy's residence" in order to retrieve some personal items.

In conclusion, it was unfortunate that matters developed as happened, much of which surely was attributable to no one in particular, and more likely to uncontrollable circumstances. None of us on the Court will ever know Mr. Russell, other than what can be pieced together by reading what surfaces in the appeal record. Clearly he had altered the numbers on two snowmobiles, and appears to have been suspected of aiding and abetting sales of such and similar items. Clearly, too, he was cooperative with the authorities, but that trait did not bode him well later on.

Judge McDermott undoubtedly spent more time working on behalf of Russell than against him. It was only natural that he was frustrated in his efforts to successfully bring Russell to a turn-about. Likewise, Russell would likely be frustrated relative to all of the money which was extracted from him, after it seemed things were going better. That frustration felt by both persons, the judge and the accused, is self-evident. While I do not know Mr. Russell, I do know Judge McDermott. I feel that I know him as well as a brother knows a brother. I feel with him the frustration which he endured, because his nature is to help those who need help. I little doubt that when the cause returns to him, and upon his own reading of the record, he will recognize that his reaction to the frustration was unfortunate, and hopefully in future dealings with Mr. Russell a mutual complacency will be the order of the day. It is because of my belief in Judge McDermott's ability to administer justice that much has been written. Hopefully Mr. Russell can, upon reading my thoughts and whatever other encouragement is available to him, be persuaded to listen quietly and carefully when a caring judge attempts to administer guidance.

This Court's intervention by granting review has only resulted in delaying the remand to Judge McDermott, which the Court of Appeals ordered long, long ago. Granting review of the State's petition was

an unfortunate mistake, but one that could have been redressed by simply conceding, as has been done before, that review was improvidently granted, which it most assuredly was.